IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 11, 2014 Session

**STATE OF TENNESSEE v. JOHNATHAN R. JOHNSON**

**Appeal from the Circuit Court for Montgomery County**
**No. 41101174     Michael R. Jones, Judge**

**No. M2013-00301-CCA-R3-CD - Filed May 15, 2014**

Johnathan R. Johnson ("the Defendant") was convicted on two counts of driving on a suspended driver's license, one count of possession of .5 grams or more of a substance containing cocaine with intent to sell or deliver, one count of possession of contraband in a penal institution, and one count of simple possession of marijuana. In this direct appeal, the Defendant contends that: (1) the trial court erred when it denied his motions to suppress certain evidence; (2) the trial court erred when it admitted evidence of a Tennessee Bureau of Investigation ("TBI") lab report which the Defendant alleges was not provided in discovery; (3) the evidence was insufficient to support his conviction for possession of .5 grams or more of a substance containing cocaine with intent to sell or deliver; and (4) the trial court erred in denying alternative sentencing. After a thorough review of the record and applicable law, we affirm the judgements of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Jacob W. Fendley, Clarksville, Tennessee, for the appellant, Johnathan R. Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; John W. Carney, District Attorney General; and Dan Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

A Montgomery County Grand Jury indicted the Defendant on two counts of driving on a suspended driver's license, one count of possession of .5 grams or more of a substance containing cocaine with intent to sell or deliver, one count of possession of contraband in a penal institution, and one count of simple possession of marijuana. Prior to trial, the Defendant moved to suppress all evidence that arose from a traffic stop conducted on September 30, 2011, and a suppression hearing was held.

Officer Dindar, with the Clarksville Police Department ("CPD") testified that he was working as a patrol officer on September 16, 2011, when he stopped the Defendant for a "light law violation." Officer Dindar explained that, to the "best of [his] knowledge at that time one of [the Defendant's] taillights was either inoperable or broken." Officer Dindar stopped the Defendant and discovered that the Defendant's driver's license was suspended. He cited the Defendant for driving on a suspended license and released him. When asked whether he recalled "exactly what was the problem" with the taillight, Officer Dindar responded, "Sir, not hundred [sic] percent, but I do remember as being [sic] related to his taillight." He further explained that, "as a general rule of thumb," he only would stop a driver for a taillight if the light was "either not working or they are cracked taillights, they're emitting or dazzling, glaring lights."

Officer Dindar testified that, on September 30, 2011, he again stopped the Defendant for a "[l]ight law violation" regarding "something to do with his taillight." Officer Dindar could not fully remember the circumstances of the stop, but he testified that, generally, when he stops a vehicle for a broken taillight with light emitting, he advises them to fix the problem with a special taillight tape. The Defendant's taillight, however, was still in violation at the time of the second stop. When the Defendant presented his license, Officer Dindar discovered that the license still was suspended. At that time, Officer Dindar made a custodial arrest of the Defendant because he "realize[d] that [the Defendant was] going to keep on doing the same thing." Officer Dindar noted that he did not recognize the Defendant's vehicle at the time he made the stop and did not make the connection to the earlier stop until he approached the Defendant.

On cross-examination, Officer Dindar confirmed that he did not recall whether, during the second stop, the Defendant had any tape on his taillight. He clarified that he would not stop somebody if the tape were applied correctly, but he would stop somebody if the tape were applied incorrectly in such a way that he could "still clearly see a white light coming out."

2

The defense called Regina Johnson, the Defendant's mother, to testify. Johnson testified that, on the night of the Defendant's second arrest, she saw the Defendant's car with "red tape over the cover . . . on the back taillight." She denied seeing a glaring light coming from the taillight.

The Defendant also testified. According to the Defendant, shortly after Officer Dindar pulled him over on September 16, he put "[w]ay more than one" layer of tape on his taillight. He testified that the tape was on his taillight when Officer Dindar pulled him over on September 30.

The trial court noted that Officer Dindar's testimony was that "he would have only made the stop if there had been a glaring light coming from the taillight, which is a violation of the statute." The trial court further found, "[The Defendant] tried to remedy the problem from the stop. Apparently, he didn't and he still had a violation in the eyes of the officer, and [Officer Dindar] does not seem to have been unreasonable in that determination." Therefore, the trial court denied the motion to suppress.

The Defendant waived his right to a jury trial and proceeded to a bench trial. Prior to the bench trial, the Defendant moved to suppress all evidence arising out of a search that occurred in the booking area of the Montgomery County jail. The trial court combined the hearing on the Defendant's second motion to suppress with the bench trial.

Officer Dindar testified that he was working as a patrol officer on September 16, 2011, when he stopped the Defendant for a "light law violation." Upon discovering that the Defendant's driver's license was suspended, Officer Dindar issued the Defendant a citation and released him. A certified copy of the Defendant's driving record was entered into evidence showing that the Defendant's license was suspended on September 16, 2011. Officer Dindar testified that he performed another traffic stop of the Defendant on September 30, 2011, again due to a "light law violation." During that stop, Officer Dindar again discovered that the Defendant's driver's license was suspended. Officer Dindar arrested the Defendant and took him to the Montgomery County Jail for booking.

Officer Dindar testified that initially he performed a "general search" of the Defendant, which he described as a "pat down search" that did not involve a cavity search or removal of any of the Defendant's clothing. While in the booking area of the Montgomery County Jail, the Defendant requested to use the bathroom. Officer Dindar remembered that the Defendant "asked to go the bathroom several times, which kind of alarmed me at that time." Officer Dindar testified, "[W]hen we let somebody go to the bathroom we always let them know do not flush the toilet; and we always watch them due to officer safety issues." Officer Dindar was under the impression that the Defendant had to urinate, and he became

suspicious when he noticed that the Defendant was "pulling [his] pants down." At that time, he noticed that the Defendant "started acting suspicious, he was holding his pants" and that "he had a very, you know, different look on his face," so he ordered the Defendant to stand up. As Officer Dindar approached the Defendant, "[the Defendant] was holding onto his pants and they were sideways, and his back hand, he was holding onto his pant, not through his belt loop or anything like that, as if he was holding something in his hand through his pants." Officer Dindar testified that this behavior "grabbed [his] attention," and he ordered the Defendant to go to the "search room" to be searched. Officer Dindar was present for the search which was conducted by jail deputies. He testified that the jail deputies recovered "the substance from [the Defendant's] pants."

On cross-examination, Officer Dindar confirmed that, at the time he was going through booking procedure at the jail, he did not believe that the Defendant was harmed or that he was in danger. He explained that, after being taken in front of the magistrate, an arrestee still must be "booked in, they still have to go through the . . . booking process, then they get released." Officer Dindar further testified that, "until the sheriffs book him in, until they get searched, until the last moment – until the sheriffs tell me that I am free to leave they are still in our custody." Officer Dindar stated that, even if the bathroom incident had not occurred, "[the Defendant] was going to be searched anyway in jail. I mean, they do get searched no matter what." He confirmed that this search upon entering the jail is not a simple pat down but rather a "thorough search." Officer Dindar also elaborated on the Defendant's behavior in the bathroom, explaining, "[The Defendant] had sufficient amount of time to use the bathroom, and all he was doing was just looking around and watching what I am [sic] doing. And based on my experience as a police officer that looked very suspicious."

On redirect examination, Officer Dindar confirmed that the Defendant was "still in the process of booking" at the time he was searched. Officer Dindar further explained the booking procedure:

> Everytime we take somebody to booking, of course, we get a mittimus, we take him inside, we submit the mittimus paperwork to the booking clerks, they start looking through our paperwork, then we take that person into the searching room, the room that they get searched, we drop their properties, if we keep part of it, being the cell phones and such things, while we're transporting them we keep that stuff and, you know, we give that to the booking search clerks, jail deputies.
>
> And while they're searching that person we wait over there and we are never allowed to leave until they get done searching that person and telling us

4

they're good to go due to the fact that sometimes they do find contrabands. Or sometimes when they're searching them they do find open wounds, sore on their body; then they have to call the nurse.

Officer Dindar testified that an arrestee is not released on bond until after booking is complete and confirmed that, even in the situation where an arrestee is to be released on his own recognizance, Officer Dindar "always" brings the arrestee to be processed through booking.

Agent Jason Hankins of the TBI testified that, on September 30, 2011, he was working with the CPD when Officer Dindar requested that he come to the Montgomery County jail. Once at the jail, Agent Hankins took a preliminary weight and performed a field test on the substance recovered from the Defendant. The substance tested positive for the presence of cocaine and had a preliminary weight of approximately 1.7 grams. Agent Hankins testified that, shortly thereafter, he interviewed the Defendant at a different location. Agent Hankins read the Defendant his Miranda rights, and the Defendant signed the waiver of rights form.

On cross-examination, Agent Hankins testified that the Defendant did not appear to be under the influence of drugs by the time he encountered him.

As to the issues involved in the second motion to suppress, the Defendant testified that, on the night he was arrested, he was searched three times. He stated that a "rookie officer" was training with Officer Dindar that night and searched him first. Next, Officer Dindar searched him and then put him in the back of the patrol car. The Defendant testified that the officers then proceeded to search his car as well as the "rim of [his] hat." According to the Defendant, he was taken before a magistrate and granted a bond to be released on his own recognizance. When he left the magistrate, he was "fixing to go into booking," but "they had a female in there so they couldn't search me right then, so I asked to use the bathroom. . . . That's when I went to the bathroom, and I came out, that's when I was searched, because the girl was finished."

On cross-examination, the Defendant testified that he could not remember if he had signed a bond to be released on his own recognizance by the time he was searched.

Regarding the Defendant's motion to suppress the evidence resulting from the search in the booking area of the jail, the trial court reasoned that the Defendant was still in custody at the time he was taken into the booking area. The trial court noted that the Defendant "would have had to have been booked, searched and then signed the bond before he would have been released." Therefore, the trial court concluded, "[The Defendant] was then taken

5

to the search room where he would have been searched and these items would have been found, so that it would inevitably been [sic] found anyway." The trial court further reasoned, "What fourth amendment rights that [a defendant] has while in custody are not as great as those that he might have if he were a free person." The trial court concluded that Officer Dindar had "reason to believe that [the Defendant] was trying to conceal something or dispose of something down the toilet." Based on that reasoning, the trial court denied the Defendant's motion to suppress.

Officer Dindar was re-called to testify for the State. He testified that the substances recovered during the search of the Defendant at the jail included "a plastic bag containing individually packed marijuana," a "soap looking material," and "some white powdery substance." He testified that, based on his experience, "the first thing that came to [his] mind was crack cocaine" when he saw the "soap looking material." Officer Dindar confirmed that these items were recovered during a search of the Defendant while the Defendant was "in the booking area . . . [i]n the secure zone of the jail." He testified that he performed field tests on the substances, but he added, "I don't hundred percent [sic] remember what I did." Officer Dindar then turned possession of the recovered substances over to Agent Hankins.

Agent Hankins was re-called by the State. He testified that Officer Dindar gave him the substances recovered from the Defendant when he arrived at the Montgomery County Jail. He performed field tests on "a bag of white powder" and "six . . . individually wrapped crystalline white substances," which all tested positive for the presence of cocaine. He also performed a field test on "a bag of green plant material" which tested positive for marijuana.

At this point in the trial, the defense learned, apparently for the first time, that the State planned to call an agent with the TBI to testify regarding the results of testing performed on the substances in question and to submit a lab report as to the results of that testing. Claiming that the lab report was never provided in discovery, the defense requested a continuance, stating, "[I]n light of the new evidence [the Defendant] has some things to consider. I'm trying to reevaluate the case." The State claimed that the lab report was included in discovery. The court granted a continuance. The trial resumed on December 5, 2012.

Agent Hankins was re-called by the State. He confirmed that he took possession of the "green plant material," "a bag of what appeared to be white crystalline rocks," and a "bag of white powder," all of which were recovered during the search of the Defendant. Agent Hankins also testified that, during his interview with the Defendant following the search, the Defendant "stated that he sells to support his habit and make a little extra money."

On cross-examination, Agent Hankins confirmed that, during his interview with the

6

Defendant, the Defendant "said he was high." However, according to Officer Hankins, the Defendant "didn't appear to be under intoxication of anything." The Defendant stated that "he smokes marijuana and crack together," a combination he referred to as a "primo."

The State then called Agent John Scott with the TBI to testify. The defense objected to his testimony on the grounds that no lab report was included in discovery. The trial court overruled the objection.

Agent John Scott, a forensic scientist with the TBI, testified as an expert in forensic chemistry. Agent Scott identified the evidence envelopes containing the substances recovered from the Defendant and confirmed that he had performed chemical analysis tests on the substances. The first substance he tested was a "white powder" which Agent Scott's testing concluded was .33 grams of cocaine. The second substance he tested included "six individual little baggies" containing "a rock like substance" which Agent Scott's testing concluded was "cocaine base" with a total weight of .9 grams. The final substance Agent Scott tested was four plastic bags containing "plant material" which his testing concluded was marijuana with a total weight of 2.36 grams.

Following Agent Scott's testimony, the State rested its case-in-chief.

The Defendant testified again on issues other than the second motion to suppress.[1] According to the Defendant, on both occasions when he was pulled over by Officer Dindar, he was not driving his own car but rather that of a friend. According to the Defendant, on the night he was pulled over, he was on his way to a friend's house "to play some cards and smoke and drink." The Defendant stated that he was suffering from a drug addiction and that the drugs were for his own personal consumption. He testified that the drugs were for him to "get high on" and would have only lasted him for one night.

On cross-examination, the Defendant denied ever telling Agent Hankins that he sold crack to help support his drug habit. The Defendant testified, "I didn't tell [Agent Hankins] specifically what I sold to support my habit." When asked, "You didn't tell [Agent Hankins] that you sold drugs, those drugs to support your habit?" the Defendant responded, "That's what it says on there."

On redirect examination, when asked to describe with whom he "would typically exchange" drugs, the Defendant responded, "It's more so of the buddies that I hang out, like the people I was going to be playing cards with." He clarified, "As you get together and put

_____

[1] Because the hearing on the second motion to suppress was incorporated into the bench trial, the Defendant's earlier testimony was limited to the issues raised in the second motion to suppress.

7

money in together to go to the store to buy some beer, it would be the same putting money together to get high together."

Following the Defendant's testimony, the defense rested its case. The trial court found the Defendant guilty on all five counts of the indictment.

The trial court conducted a sentencing hearing on January 9, 2013. At the sentencing hearing, the presentence report was admitted as an exhibit without objection. At the conclusion of the hearing, the trial court sentenced the Defendant to six months on each of his convictions for driving on a suspended driver's license, twelve years on his conviction for possession of .5 grams or more of a substance containing cocaine with intent to sell or deliver, six years on his conviction for possession of contraband in a penal institution, and eleven months and twenty-nine days on his conviction for simple possession of marijuana. The trial court denied alternative sentencing and accordingly ordered the Defendant to serve his sentence in confinement. The trial court also ordered that all sentences run concurrently to each other, for a total effective sentence of twelve years' incarceration. The Defendant filed a timely notice of appeal.[2]

## **Analysis**

### *Motions to Suppress*

Both the Fourth Amendment to the United States Constitution and Article I, section 7, of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 630 (Tenn. 1997). "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Likewise, "[q]uestions about witness credibility and 'resolution of conflicts in the evidence are matters entrusted to the trial judge.'" State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (quoting Odom, 928 S.W.2d at 23). "Our review of a trial court's application of law to the facts, however, is conducted under a de novo standard of review." Walton, 41 S.W.3d at 81 (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); Yeargan, 958 S.W.2d at 629. Finally, we note that the prevailing party on a motion to suppress "is entitled to the strongest

---

[2] Because the instant appeal arose from a non-jury trial, the Defendant was not required to file a motion for new trial. See Tenn. R. App. P. 3(e); State v. Isaiah Burton, Jr., No. M2005-00690-CCA-R3-CD, 2006 WL 1896364, at *7 (Tenn. Crim. App. July 7, 2006).

legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001) (citing Odom, 928 S.W.2d at 23; State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000)).

## September 30 Traffic Stop

The Defendant first contends that the trial court improperly denied his motion to suppress the evidence that resulted from the traffic stop on September 30, 2011. Specifically, the Defendant argues that the State failed to show at the suppression hearing that the stop constituted a lawful seizure under the Fourth Amendment.

Our supreme court has recognized that, "[u]pon turning on the blue lights of a vehicle, a police officer has clearly initiated a stop and has seized the subject of the stop within the meaning of the Fourth Amendment." Binette, 33 S.W.3d at 218. However, a warrantless investigatory stop of a motor vehicle is lawful under the Fourth Amendment "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968); Griffin v. State, 604 S.W.2d 40, 42 (Tenn. 1980)).

In the instant case, Officer Dindar testified that he stopped the Defendant because he observed a "[l]ight law violation" regarding "something to do with [the Defendant's] taillight." He admitted that he could not remember "a hundred percent" the circumstances of the malfunctioning taillight, but he testified that the Defendant's taillight was not in compliance with the applicable statute. See Tenn. Code Ann. § 55-9-402(b) (2008). He could not remember "a hundred percent" whether the Defendant had attempted to put any tape on his taillight since the time of the previous stop. However, Officer Dindar testified that, in his experience, taillight tape can be applied incorrectly such that "you still have dazzling and glaring lights emitting from [the] taillight," and "as far as the state of Tennessee law is concerned that is not acceptable." When asked whether he stopped the Defendant "purely for the light law [violation]," he responded, "Yes, sir. Absolutely." In denying the Defendant's motion to suppress, the trial court reasoned that Officer Dindar "would have only made the stop if there had been a glaring light coming from the taillight, which is a violation of the statute." The trial court concluded that "[the Defendant] tried to remedy the problem from the stop. Apparently, he didn't and he still had a violation of the light law in the eyes of the officer, and [Officer Dindar] does not seem to have been unreasonable in that determination."

Our supreme court has held that, "[i]n determining whether a police officer's

9

reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances," including, among other things, "objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." Watkins, 827 S.W.2d 293. A court also may consider "rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Watkins, 827 S.W.2d 293.

In the instant case, Officer Dindar's reason for stopping the Defendant was based on his observation that the Defendant was in violation of the statute governing taillights. Although Officer Dindar could not recall the specific nature of the defect, or whether the Defendant had attempted a repair, he did testify that the Defendant's light was malfunctioning and that it was in violation of the statute. Furthermore, although the Defendant asserted that he had properly covered the light, the Defendant's own testimony that his taillight was in fact broken on the night he was pulled over and that he previously had attempted to repair it with tape corroborated Officer Dindar's testimony. The trial court clearly chose to accredit Officer Dindar's testimony that the taillight was in violation of the statute at the time the Defendant was pulled over. The evidence does not preponderate against the trial court's finding. Officer Dindar's observation that the Defendant's taillight was in violation of the statute was more than sufficient to constitute the reasonable suspicion necessary to justify the investigatory stop. Therefore, we hold that the trial court properly denied the Defendant's motion to suppress. The Defendant is entitled to no relief on this issue.

<u>Montgomery County Jail</u>

The Defendant also challenges the trial court's denial of his motion to suppress the evidence resulting from the search of the Defendant in the booking area of the Montgomery County Jail. He argues that "once a magistrate orders a person released upon their personal recognizance then that person is no longer under arrest or in custody." Therefore, the Defendant asserts that Officer Dindar's search was unlawful under the Fourth Amendment because the Defendant had a reasonable expectation of privacy and "there was no new probable cause to allow either Clarksville Police or the Montgomery County Sheriff's Department to seize the Defendant after he had been ordered released."

An inventory search "in accordance with routine administrative procedures" involved in booking and processing an arrestee through a detention facility is a well-recognized exception to the warrant requirement. Watkins, 827 S.W.2d at 295 (citing South Dakota v. Opperman, 428 U.S. 364, 372 (1976)). When the subject of a custodial arrest is transported to a detention facility, "[l]aw enforcement authority in such cases extends to performing a detailed 'inventory search' of all personal effects in the arrestee's possession, and possibly

of the vehicle in which he was riding at the time of arrest, if that vehicle is also seized." Crutcher, 989 S.W.2d at 301 (citing Illinois v. Lafayette, 462 U.S. 640, 648 (1983)); see also Cothran, 115 S.W.3d at 526 ("When [the defendant] arrived at the police station, a deputy again searched him and found a bag of marijuana and rolling papers on his person. These items were lawfully seized pursuant to a valid inventory search at the police station.").

The United States Supreme Court has noted that "routine administrative procedure[s] at a police station house incident to booking and jailing the suspect derive from different origins and have different constitutional justifications" than a search based on probable cause. Maryland v. King, ___ U.S. ___, 133 S.Ct. 1958, 1970 (2013). An inventory search incident to arrest is not based on the "fair probability that contraband or evidence of a crime will be found" but rather on the administrative and security concerns inherent to formally processing an arrestee. Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983). Such justifications include "(1) the protection of the owner's property while it remains in police custody, (2) the protection of the police against claims or disputes over lost or stolen property, and (3) the protection of the police from potential danger." State v. Glenn, 639 S.W.2d 584, 585-86 (Tenn. 1983) (citing South Dakota v. Opperman, 428 U.S. 364, 369 (1976)). Similarly, our supreme court has recognized that "the policy of maintaining prison security is a legitimate factor that may bear upon the objective reasonableness of an expectation of privacy." Munn, 56 S.W.3d at 496; see also State v. Putt, 955 S.W.2d 640, 644 (Tenn. Crim. App. 1997) ("[T]he fact that the defendant had entered the grounds of the prison facility diminishes her usual expectation of privacy. This intrusion on her privacy is outweighed by the State's substantial interest in preventing the introduction of drugs into prison facilities.").

Officer Dindar testified that the Defendant requested to use the bathroom while he was "in the booking area . . . [i]n the secure zone of the jail." Officer Dindar's testimony is clear that, although the Defendant eventually was to be released on his own recognizance, the Defendant was still in the midst of normal administrative booking procedures at the time he was searched. Officer Dindar explained that, after being taken in front of a magistrate, an arrestee still must go through the "booking process," even in such instance that they are granted a bond to be released on their own recognizance. Officer Dindar's testimony was that the normal booking process involves a "thorough" search of the arrestee as he enters the jail and that no arrestee is released on bond until after he completes the booking process. According to the Defendant's own testimony, at the time he asked to use the bathroom, he was in the holding area "fixing to go into booking" but was waiting because there was a "female in there so they couldn't search me right then." Based on this testimony, the trial court concluded that the Defendant "would have had to have been booked, searched and then signed the bond before he would have been released" and that even if the bathroom incident had not occurred, the Defendant "would have been searched and these items would have

11

been found, so that it would inevitably been found [sic] anyway."

It is clear from the testimony that a search of the Defendant as a part of a normal administrative booking procedure at the jail was imminent. Even when an arrestee is to be eventually released on his own recognizance, he is still subject to the normal booking procedure following arrest, as there is still a legitimate law enforcement interest in doing such things as making a record of the arrest, obtaining basic biographical information, taking fingerprints, and photographing the arrestee. Nothing in the record suggests that the impending search of the Defendant was anything other than a routine inventory search inherent to that normal booking procedure. Under the doctrine of inevitable discovery, "illegally obtained evidence is admissible if the evidence would have otherwise been discovered by lawful means." State v. Cothran, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003) (citing Nix v. Williams, 467 U.S. 431, 444 (1984); State v. Ensley, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996)).

Furthermore, we agree with the trial court that the Defendant had a diminished expectation of privacy at the time he was in the holding area of the jail waiting to be booked and that he was still in the custody of Officer Dindar.[3] The evidence does not preponderate against the trial court's findings. Therefore, we hold that the trial court properly denied the Defendant's motion to suppress. The Defendant is entitled to no relief on this issue.

*TBI Lab Report*

The Defendant also contends that the trial court erred when it admitted evidence of the TBI lab report which he alleges was not provided in discovery. According to the Defendant, he was "essentially ambushed after waiving a jury trial in this matter" when the State failed to provide "an extremely vital piece of evidence in a drug case."

The Tennessee Rules of Criminal Procedure mandate that, "[u]pon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments." Tenn. R. Crim. P. 16(a)(1)(G)(iii). Should the State fail to comply with a defendant's discovery request, the court has a number of available options:

> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;

---

[3] Indeed, the Defendant's suspicious actions observed by Officer Dindar in the restroom may have constituted an independent basis for a finding of probable cause justifying the search by Officer Dindar. Because the trial court did not rely on that reasoning, we will not address it.

(B) grant a continuance;

(C) prohibit the party from introducing the undisclosed evidence; or

(D) enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2). "A trial court has wide discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction should fit the circumstances of the case. State v. Downey, 259 S.W.3d 723, 737 (2008).

In the instant case, the record reveals that the Defendant submitted his discovery request in September 2012. However, we have no way to glean from the record whether the lab report was included in the discovery provided to the Defendant. Nonetheless, the trial court, in fashioning a remedy for the State's apparent non-compliance with the Defendant's discovery request, determined that the appropriate course of action under the particular circumstances was to grant a continuance. Accordingly, the trial court granted a six-week continuance from the date of the Defendant's objection on October 24, 2012, until December 5, 2012, giving the Defendant plenty of time to prepare for the TBI lab report. Therefore, the trial court did not abuse its discretion. The Defendant is entitled to no relief on this issue.

*Sufficiency of the Evidence*

The Defendant also contends that the evidence was not sufficient to support his conviction for possession of .5 grams or more of a substance containing cocaine with intent to sell or deliver.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a defendant is found guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial

13

evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). In a bench trial, the judge is the trier of fact, and "'the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict.'" State v. Farrar, 355 S.W.3d 582, 585 (Tenn. Crim. App. 2011) (quoting State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999)); see also State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

Under Tennessee Code Annotated sections 39-17-417(a)(4) (2010) and 39-17-417(c)(1) (2010), anyone who knowingly possesses a .5 grams or more of "any substance containing cocaine" with "intent to manufacture, deliver or sell" that substance is guilty of a Class B Felony. Tennessee statute defines "deliver" as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Tenn. Code Ann. § 39-17-402(6) (2010). To "sell" is defined as "a bargained-for offer and acceptance, and an actual or constructive transfer or delivery of the subject matter property." State v. Holston, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002).

As previously discussed herein, the Defendant was found to have been in possession of a "white powder" and "six individual little baggies" containing "a rock like substance." Agent Scott testified that the weight of the white powder was .33 grams, and the total weight of the rock like substance was .9 grams. Agent Scott further testified that all of those substances individually tested positive for the presence of cocaine. Agent Hankins testified that, during his interview with the Defendant regarding these substances, the Defendant made a statement that "he sells to support his habit and make a little extra money." When asked who he would "typically exchange" drugs with, the Defendant responded, "It's more so of the buddies that I hand out [sic], like the people I was going to play cards with." He clarified, "as you get together and put money in together to go to the store to buy some beer, it would be the same putting money together to get high together." Based on the Defendant's own admission that he sold drugs to support his habit, that the Defendant was in possession of several individual packages of cocaine, and his own testimony that he typically split the cost and delivered drugs to the very people whom he was on his way to visit when he was pulled over, there was more than enough evidence to lead a rational trier of fact to conclude that the Defendant was in possession of .5 grams or more of a substance containing cocaine

14

with intent to sell or deliver. Thus, the Defendant is entitled to no relief on this basis.

*Sentencing*

Finally, the Defendant challenges the sentence imposed by the trial court, arguing that he should have been placed on community corrections. Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

15

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has

the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant contends that the trial court should have considered an alternative sentence to incarceration. Our supreme court recently held that the Bise standard of review also is applicable to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Thus, in reviewing a trial court's denial of an alternative sentence, the applicable standard of review is abuse of discretion with a presumption of reasonableness so long as the sentence "reflect[s] a decision based upon the purposes and principles of sentencing." Id.

In the instant case, the trial court determined that the Defendant was a Range II multiple offender. See Tenn. Code Ann. § 40-35-106 (2010). The presentence report, entered as evidence in the sentencing hearing, reveals that the Defendant had four prior felony convictions in addition to a number of misdemeanor convictions dating back to 2003. Based on that history, the trial court found that the Defendant had a long history of criminal convictions. Furthermore, the record reveals that the Defendant has prior probation violations. The court noted that, prior to committing the instant offenses, the Defendant recently had been released after serving over six years in prison for possession of cocaine. At the time the Defendant received that conviction in 2005, he was still on probation for an earlier conviction for possession of cocaine that he received in 2003. Based on this, the trial court found that less restrictive measures of confinement had been frequently and recently applied unsuccessfully. Therefore, the trial court denied the Defendant's request for alternative sentencing and ordered that the Defendant serve his effective twelve year sentence in confinement. We hold that the trial court imposed the Defendant's sentence in a manner consistent with the purposes, principles, and goals of the Sentencing Act. Accordingly, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

17